## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JAMI SOUZA, on behalf of her son and all others similarly situated, and MARY MILLER (a pseudonym), on behalf of her son and all others similarly situated,<br><br>                Plaintiffs,<br><br>   v.<br><br>HEALTH CARE SERVICE CORPORATION,<br><br>               Defendant. | Case No.  4:21-cv-02733 |

## CLASS ACTION COMPLAINT

Plaintiffs Jami Souza, on behalf of her son and all others similarly situated, and Mary Miller (a pseudonym[1]), on behalf of her son and all others similarly situated, complain as follows against Defendant Health Care Service Corporation ("HCSC" or "Defendant").

## INTRODUCTION

1.     This case arises from Defendant HCSC's adoption and use of certain clinical coverage criteria to determine whether residential treatment of mental health conditions and/or substance use disorders (collectively referred to as "behavioral health conditions") was medically necessary and, thus, covered by the health benefit plans HCSC administers.

---

[1] Plaintiff Mary Miller, on behalf of her adult son, challenges Defendant's policies and practices relating to its clinical denial of her son's residential mental health treatment. Because of the nature of her son's mental illness, Plaintiff Miller has legitimate concerns about publicly disclosing her or her son's identity. Thus, Plaintiff Miller has chosen to file this action pseudonymously, using the name "Mary Miller." Her identity and that of her son will be fully disclosed to Defendant and the Court, so long as such identifying information is not released into the public record. Plaintiff Miller intends to file a motion for leave to proceed anonymously as soon as practicable after the Complaint is served.

2.      Although HCSC acknowledged that the plans it administered defined medical necessity as requiring services to be consistent with generally accepted standards of medical practice, HCSC nevertheless selected as its standard interpretation of those plan terms a set of criteria that were much more restrictive than generally accepted standards and that did not comport with the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), and then used those plan-violating criteria to deny Plaintiffs' sons' requests for coverage for their residential behavioral health treatment.  By denying coverage pursuant to criteria that contradicted the plans' written terms and violated MHPAEA, HCSC breached its fiduciary duties to the Plaintiffs' sons and rendered denials that were arbitrary and capricious, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001-1461.

## THE PARTIES

3.      Plaintiff **Jami Souza** brings this action on behalf of her adult son pursuant to a duly-executed power of attorney. Ms. Souza and her son are permanent residents of Kingwood, Texas. At all times relevant to this Complaint, Plaintiff Souza's son was a beneficiary of a self-funded welfare benefit plan sponsored by Plaintiff Souza's employer, TETRA Technologies, Inc. (the "Souza Plan"). The Souza Plan is governed by ERISA.

4.       Plaintiff **Mary Miller** is the court-appointed guardian for her adult son and brings this action on her son's behalf. Ms. Miller and her son are permanent residents of Oklahoma City, Oklahoma. At all times relevant to this Complaint, Plaintiff Miller's son has been, and is now, a participant in a fully-insured plan sponsored by his employer, Air Technologies (the "Miller Plan"). The Miller Plan is governed by ERISA.

5.      Defendant **Health Care Service Corporation** ("HCSC") is a Mutual Legal Reserve Company that is headquartered in Chicago, Illinois. HCSC issues and administers health

2

insurance plans in five states (Illinois, Montana, New Mexico, Oklahoma, and Texas) as a licensee of the Blue Cross Blue Shield Association.

6.     HCSC is the one of the largest health insurance administrators in the country, with nearly 17 million members. In 2020 alone, HCSC claimed to have processed mental health claims on behalf of more than 1.8 million members.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

8.     Personal jurisdiction exists over HCSC, and this District is the proper venue, because Plaintiff Souza and her son reside in this District, and HCSC administers plans in this District and regularly communicates with insureds who reside in this District. 29 U.S.C. §1132(e)(2).

## FACTUAL ALLEGATIONS

## I.     <u>RELEVANT TERMS OF THE PLAINTIFFS' PLANS</u>

9.     Plaintiffs' Plans both cover treatment for sickness, injury, mental illness, and substance use disorders. Residential treatment is a covered benefit under both Plaintiffs' Plans. Neither the Souza Plan nor the Miller Plan limits residential treatment services to acute or emergency services or to short-term crisis intervention.

10.     Individual and group therapy and Mental Health Partial Hospital/Day Treatment ("PHP") likewise, are covered benefits under both Plaintiffs' Plans.

11.     Under both Plaintiffs' Plans, one essential condition of coverage is that the services for which coverage is sought must be "medically necessary." The Plans also exclude coverage for services HCSC determines are not "medically necessary."

12.     The Souza Plan defines "medically necessary" services to mean services that are, among other things, "provided in accordance with and are consistent with generally accepted standards of medical practice in the United States."

13.     The Miller Plan, likewise, defines "medically necessary" services to mean services that are, among other things, "in accordance with generally accepted standards of medical practice."

14.     Thus, under the terms of both Plaintiffs' Plans, one essential condition of coverage is that the services for which coverage is sought must be consistent with generally accepted standards of medical practice.

15.     As the benefits administrator for the Plaintiffs' Plans, HCSC is responsible for determining that the services for which coverage is requested are medically necessary before it approves coverage. To make benefit determinations under each Plan, therefore, HCSC must interpret and apply the Plans' generally accepted standards requirement whenever it makes a medical necessity determination.

16.     When HCSC denies a request for coverage under an ERISA plan, its standard practice—as required by ERISA and its implementing regulations—is to issue a written notification of the denial, which, among other things: states all of the reasons for the determination; identifies the plan term(s) on which the denial is based; and identifies any internal guideline HCSC relied upon in making the determination. Both Plaintiffs' sons received written notifications of denial that stated their requests for coverage of residential treatment were denied for lack of medical necessity, as further alleged below.

II.     **HCSC'S ROLE AS A BENEFIT CLAIM ADMINISTRATOR FOR ERISA PLANS**

17.     At all times relevant to this Complaint, HCSC (d/b/a "Blue Cross Blue Shield of Texas") was the Claim Administrator for the Souza Plan. The Souza Plan granted authority and

discretion to HCSC to interpret plan terms, including limitations and exclusions, to determine whether services are covered, to cause any resulting benefit payments to be made by the Plan, and to decide administrative appeals from any denials of coverage under the Plan. At all times relevant to this Complaint, HCSC (d/b/a "Blue Cross Blue Shield of Oklahoma") was, and still is, the underwriter of and Claim Administrator for the Miller Plan. The Miller Plan granted authority and discretion to HCSC to interpret plan terms, including limitations and exclusions, to determine whether services are covered, to cause any resulting benefit payments to be made by the Plan, and to decide administrative appeals from any denials under the Plan.

18.     When HCSC denies a request for coverage under a plan it administers, the legal consequence is that the plan will not pay any benefits for the services for which coverage was requested. As a result, upon receiving the denial, the participant has only three choices: to pay for treatment out-of-pocket; to seek different treatment for which coverage may be approved; or to forego treatment altogether. Because HCSC had and exercised discretion with respect to the administration of the Plaintiffs' sons' plans and made final and binding benefit determinations under the Plans, HCSC was, and still is, a fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(21)(A) and 29 U.S.C. § 1104. As such, HCSC owed fiduciary duties to Plaintiffs' sons with respect to its administration of their Plans, including its interpretation of plan terms and its determinations of coverage.

19.     Pursuant to 29 U.S.C. § 1104, ERISA fiduciaries owe a duty of loyalty to plan participants and beneficiaries, which requires them to discharge their duties "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan. ERISA fiduciaries also owe plan participants and beneficiaries a duty of

care, which requires them to act with reasonable "care, skill, prudence, and diligence" in carrying out their responsibilities with respect to plan administration. ERISA fiduciaries, further, owe plan participants and beneficiaries a fiduciary duty to administer the plans in accordance with the written plan terms, insofar as those terms are consistent with ERISA.

20.     As alleged in further detail below, HCSC breached each of those fiduciary duties to Plaintiffs' sons and to all others similarly situated when it adopted excessively restrictive medical necessity criteria and used them to deny coverage in violation of plan terms.

## III.   GENERALLY ACCEPTED STANDARDS OF MEDICAL PRACTICE

21.     Generally accepted standards of medical practice, in the context of mental health and substance use disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals. The accepted medical standards at issue in this case do not vary state-by-state.

22.     In the field of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. There are generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' conditions. These generally accepted standards of medical practice are described in multiple sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies, including: (a) the American Association of Community Psychiatrists' ("AACP's") Level of Care Utilization System ("LOCUS"); (b) the American Society of Addiction Medicine ("ASAM") Criteria; (c) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the Child and Adolescent Service Intensity Instrument ("CASII"), which was developed by AACAP in 2001 as a refinement of CALOCUS; (d) the Medicare Benefit

6

Policy Manual issued by the Centers for Medicare and Medicaid Services; (e) the APA Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition; (f) the APA Practice Guidelines for the Treatment of Patients with Eating Disorders, Third Edition; (g) the American Psychiatric Association's Practice Guidelines for the Treatment of Patients with Major Depressive Disorder; and (h) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers.

23.    The generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' mental health conditions and substance use disorders include the following:

(a)    **First**, many mental health and substance use disorders are long-term and chronic. While current or acute symptoms are typically related to a patient's chronic condition, it is generally accepted in the behavioral health community that effective treatment of individuals with mental health or substance use disorders is not limited to the alleviation of the current or acute symptoms. Rather, effective treatment requires treatment of the chronic underlying condition as well.

(b)    **Second**, many individuals with behavioral health diagnoses have multiple, co-occurring disorders. Because co-occurring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all of the individual's conditions. Similarly, the presence of a co-occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

(c)    **Third**, in order to treat patients with mental health or substance use disorders effectively, it is important to "match" them to the appropriate level of care. The

driving factors in determining the appropriate treatment level should be safety and effectiveness. Placement in a less restrictive environment is appropriate only if it is likely to be safe and *just as effective* as treatment at a higher level of care.

(d)     **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than clinically indicated results in an increase in adverse outcomes.

(e)     **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

(f)     **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment. Similarly, it is inconsistent with generally accepted standards of medical practice to require discharge as soon as a patient becomes unwilling or unable to participate in treatment.

(g)     **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for

8

mental health or substance use disorders. One of the ways practitioners should take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

(h)     **Eighth**, the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient. Except in acute situations that require hospitalization, where safety alone may necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

## IV.     HCSC'S STANDARDIZED MEDICAL-NECESSITY CRITERIA

24.     On information and belief, most, if not all, of the employer-sponsored plans HCSC administers contain a medical-necessity term that requires services to be consistent with generally accepted standards of care.

25.     To ensure that its application of this medical necessity requirement is consistent across plans, HCSC adopts standardized medical-necessity criteria, which it uses when making benefit determinations for all the employer-sponsored plans it administers.

26.     MCG Health, LLC ("MCG") assists health insurance companies and benefit administrators like HCSC by creating and selling clinical coverage guidelines that are used by administrators as criteria for determining which services are medically necessary, as required for coverage under the applicable plans.

27. Starting in or about December 2016, HCSC licensed the MCG Behavioral Health Care Guidelines, a set of proprietary medical-necessity criteria offered by MCG, and adopted those criteria as its standard, company-wide medical necessity criteria for behavioral health treatment.

28. The MCG Behavioral Health Care Guidelines that HCSC licensed and used in making coverage determinations included, among other criteria, guidelines for evaluating the medical necessity of residential treatment for behavioral health conditions, entitled "Residential Acute Behavioral Health Level of Care, Adult" and "Residential Acute Behavioral Health Level of Care, Child or Adolescent."

29. HCSC also licensed and used MCG medical-necessity guidelines applicable to residential treatment of certain diagnoses, including but not limited to guidelines entitled "Schizophrenia Spectrum Disorders: Residential Care."

30. From approximately December 2016 through the present, HCSC has systematically used the MCG Behavioral Health Level of Care Guidelines complained of herein to make medical necessity determinations with respect to requests for coverage of behavioral health treatment under the employer-sponsored plans it administered, including Plaintiffs' sons' Plans.

## V. THE MCG BEHAVIORAL HEALTH CARE GUIDELINES APPLICABLE TO RESIDENTIAL TREATMENT ARE INCONSISTENT WITH GENERALLY ACCEPTED STANDARDS OF MEDICAL PRACTICE

31. MCG has from time to time issued revised editions of its Behavioral Health Care Guidelines, including the guidelines described herein. The current version of the MCG Behavioral Health Care Guidelines is the 25th Edition. At all times relevant to this Complaint, the MCG Behavioral Health Care Guidelines in effect that applied to residential treatment were (and still are) inconsistent with generally accepted standards of medical practice, as described below.

32. The MCG Behavioral Health Care Guidelines include numerous footnote citations to peer-reviewed medical literature and physician specialty society recommendations that

10

purportedly "support" the MCG criteria. In reality, year after year, the MCG guidelines for evaluating the medical necessity of residential treatment have been inconsistent with the primary sources on which they purport to rely and have distorted the generally accepted standards of medical practice for the treatment of behavioral health disorders, as explained below.

33.     The MCG Behavioral Health Care Guidelines for RTC condition coverage of residential treatment for mental health conditions on the presence of acute factors. In particular, MCG's guidelines for evaluating residential treatment services improperly heightened the relevance of acute symptoms and conditions while minimizing the relevance of non-acute symptoms and conditions – including chronic mental health conditions or substance use disorders that are persistent and/or pervasive and could not necessarily be effectively treated by short-term clinical interventions.

34.     For example, the 20th edition of MCG's "Residential Acute Behavioral Health Level of Care" criteria—both the adult and child/adolescent versions—specify that, to be medically necessary upon admission, residential services must satisfy a number of mandatory, threshold conditions:

(a)     First, that "[a]round-the-clock behavioral care is necessary" because of: (1) "danger to self" due to auditory hallucinations or persistent thoughts of suicide or serious harm to self that cannot be adequately monitored; (2) "danger to others" due to auditory hallucinations or persistent thoughts of homicide or serious harm to another that cannot be adequately monitored; or (3) a behavioral health disorder characterized by (a) daily occurrence of "moderately severe psychiatric or behavioral symptoms or conditions requiring treatment," such as hallucinations, delusions, disorganized speech, and so on; *and* (b) "serious dysfunction in daily living," indicated by impulsive or abusive

behaviors; avoidance of almost all social interaction; consistent failure to achieve self-care; serious disturbance in "vegetative status" (weight/sleep) threatening physical function; or (for adults) an inability to fulfill obligations, like work or parenting, with extended neglect of such responsibilities; or (for children/adolescents) an inability to perform adequately in school due to disruptive or aggressive behavior; or (for children/adolescents) a severely diminished ability to assess the consequences of one's actions, indicated by, e.g., "severe property damage"; or (4) the patient is transferring from another level of care and requires around-the-clock behavioral care.

(b)       Second, *all* of the following must be true (in addition to other requirements): (1) treatment at a lower level of care is not "feasible"; (2) *"[v]ery short-term* crisis intervention and resource planning for continued treatment at a nonresidential level is unavailable or inappropriate"; (3) "[p]atient is *willing* to participate in treatment within highly structured setting voluntarily" (if adult) or "agrees to participate at direction of parent or guardian" (if a child/adolescent); *and* (4) "biopsychosocial stressors have been assessed and are absent or *manageable* at proposed level of care" (emphasis added).

35.     The MCG guideline for "Schizophrenia Spectrum Disorders: Residential Care" incorporates the same restrictive admission criteria.

36.     These requirements are much more restrictive than generally accepted standards. For example, contrary to generally accepted standards of medical practice, the MCG guidelines condition admission to residential treatment on the presence of suicide/homicide factors that cannot be "monitored adequately" at lower levels of care, rather than on the presence of suicide/homicide factors that cannot be as *effectively or safely treated* at lower levels of care.

12

37.     The MCG guidelines also provide that persistent thoughts of suicide or homicide coupled with "ready access to lethal means" may be a basis for residential admission, while generally accepted standards indicate that those factors are far more consistent with the degree of lethality warranting a higher level of care (i.e., hospitalization). The MCG criteria thus unjustifiably raise the acuity bar for admission to the residential level of care, and are inconsistent with the primary sources MCG cites in support of its criteria.

38.     The MCG guidelines also improperly limit the behavioral health disorders that may warrant residential treatment to those involving "psychiatric symptoms which are acute," including obsessions and compulsions, "or represent a worsening over baseline," instead of acknowledging the generally accepted standard that conditions and symptoms may be chronic but still significantly impairing, such that residential treatment may be the most appropriate level of care even in the absence of acute symptoms.

39.     Even if patients meet the unjustifiably stringent acuity thresholds described above, the MCG guidelines provide that residential treatment is not medically necessary if treatment at a lower level of care is "feasible." As described above, however, under generally accepted standards of medical practice, treatment at a less intensive level of care must be "as effective" and as safe as the more intensive level of care – not merely "feasible."

40.     The MCG guidelines' stringent criteria also require that "very short-term crisis intervention" at a non-residential level be unavailable or inappropriate – thus indicating that covered care at a residential level is expected to be for "very short-term crisis intervention." This requirement is inconsistent with generally accepted standards of medical practice, which do not restrict residential treatment to "crisis intervention" and which do not limit residential treatment to artificially predetermined durations, let alone to "very short-term" stays.

13

41. The MCG guidelines also improperly limit the scope and duration of residential treatment by providing that biopsychosocial stressors – which, according to MCG, include comorbid conditions – need only be "manageable" at the proposed level of care, thus setting the expectation that "management" of comorbid conditions is all that is required. Generally accepted standards of medical practice, however, recognize that biopsychosocial stressors, if present, including comorbid conditions, must be "effectively treated" – not merely "managed."

42. Furthermore, to meet medical necessity under the MCG guidelines, adult patients must be "willing" to participate in treatment in a highly structured setting "voluntarily," and children and adolescents must at least agree to participate. This criterion, too, is inconsistent with accepted standards of medical practice, which recognize that a lack of motivation for treatment may necessitate *higher* levels of care and that treatment might not be sought at one's own initiative (*e.g.*, a court, conservator, or guardian may demand or require it).

43. The MCG guidelines also fail to account for cumulative clinical severity along multiple, independent domains of biopsychosocial function (such as patient resilience, response to prior treatment, and environmental stressors).

44. At the same time as the MCG guidelines unjustifiably restrict admission to residential treatment, the criteria call for discontinuation of such care as soon as risk of harm, functional impairments, and comorbidities can be "managed" – rather than "safely and effectively treated" – at lower levels. As discussed above, under generally accepted standards of medical practice, treatment at a less intensive level of care is warranted only if it is just as effective and safe as the more intensive level of care. Superficially "managing" a patient's condition is not sufficient.

45.     In sum, on their face, both the adult and child/adolescent versions of the MCG Residential Acute Behavioral Health Level of Care guidelines and the MCG guideline for Schizophrenia Spectrum Disorders: Residential Care provide that residential behavioral health treatment is only medically necessary for crisis stabilization or other circumstances in which a patient is suffering from acute symptoms. As such, these MCG guidelines are much more restrictive than the generally accepted standards of medical practice, which recognize that persistent and/or pervasive behavioral health disorders cannot be as effectively or safely treated on a short-term and/or outpatient basis as they could be in residential care.

46.     On information and belief, all of the MCG Behavioral Health Care Guidelines that provide medical necessity criteria for residential treatment of mental illnesses or substance use disorders contain the same problematically restrictive criteria as the three guidelines described above.

## VI.   THE MCG BEHAVIORAL HEALTH CARE GUIDELINES FOR RESIDENTIAL TREATMENT ARE MORE RESTRICTIVE THAN THE MCG GUIDELINES FOR MEDICAL/SURGICAL TREATMENT AT INTERMEDIATE INPATIENT FACILITIES

47.     MCG's decision to develop guidelines *only* for "acute" residential care of behavioral health conditions, and not for treatment of chronic behavioral health conditions at the residential level of care, was knowing and intentional. As MCG admitted in a 2017 white paper, MCG views intermediate levels of care (including residential treatment) for behavioral health conditions very differently from intermediate levels of care for medical/surgical conditions:

> While inpatient and outpatient levels of care are common to both [mental health and substance use disorder ("MHSUD") benefits] and physical health conditions, there is a divergence in how intermediate levels of care (*e.g.*, services less intensive than would be available in an inpatient hospital setting, but more expansive than care that could be provided in most outpatient clinics) are managed.
>
> . . . Intermediate levels of care for ***medical/surgical conditions are designed to improve functional status among people with impairments that, while potentially***

15

*significant, generally are not acute, and are not offered as alternatives to inpatient admission.* As an example, the presence of an acute pulmonary infection, such as pneumonia, likely would lead to a denial of admission to a pulmonary rehabilitation program [an intermediate level of care].

In contrast*, intermediate levels of care for MHSUDs are designed to support acute management of patients with MHSUDs. They often service as alternative to inpatient care, and are intended to have the ability address acute symptoms or provide crisis stabilization* . . . (emphasis added).

"Mental Health Parity: Where Have We Come From? Where Are We Now?" available at https://www.ahip.org/wp-content/uploads/2017/06/MCG-White-Paper-Mental-Health-Parity.pdf.

48.     As the MCG white paper demonstrates, MCG takes the position that while intermediate care for medical/surgical services is designed to address sub-acute conditions in order to improve functional status, intermediate care for behavioral health services is only available "to support acute management" and to "address acute symptoms or provide crisis stabilization."

49.     Reflecting this disparate and misguided approach, the MCG guidelines for skilled nursing/recovery facilities (i.e., intermediate inpatient care) for medical conditions expressly condition admission on the *absence* of "acute hospital care needs" and, unlike the MCG Behavioral Health Care Guidelines, prioritize treatment effectiveness and safety instead of superficially focusing on "feasibility" of care at a lower level.

50.     Nor could the acute-driven focus of the MCG Behavioral Health Care Guidelines have been lost on HCSC.  As noted above, the MCG guideline applicable to residential treatment for behavioral health disorders was entitled "Residential *Acute* Behavioral Health Level of Care" – at least as of the 20th Edition, which HCSC licensed and used to deny coverage to Plaintiff Souza's son. Thus, when HCSC licensed the MCG Behavioral Health Care Guidelines, which included the Residential *Acute* Behavioral Health Level of Care guidelines and various diagnosis-specific guidelines containing the same criteria, it knew or should have known that its use of those

criteria would unreasonably restrict the scope of available coverage for residential treatment of behavioral health conditions.

51.     Moreover, until relatively recently, MCG's website also reflected its view that residential treatment is only available for "acute" behavioral health conditions. Until at least October 30, 2019, MCG publicly touted a set of "Level of Care Comparison Charts" that "allow[ed] a side by side comparison of behavioral health level of care criteria" to "facilitate placement decisions for behavioral health levels of care." As MCG's own description of its chart made clear, MCG recognized only "5 levels of care" for behavioral health treatment: "inpatient, *acute* residential, partial hospital, intensive outpatient, and *acute* outpatient care" (emphasis added).

52.     After being named in a lawsuit challenging its acuity-focused guidelines, MCG scrubbed its website to remove references to "acute" RTC and "acute" outpatient services. That cosmetic change, however, did not alter the fact that the MCG Behavioral Health Care Guidelines for residential treatment are improperly acute-focused and otherwise in conflict with generally accepted standards of medical practice, as detailed above.

## VII.   HCSC BREACHED ITS FIDUCIARY DUTIES BY ADOPTING AND USING THE MCG BEHAVIORAL HEALTH CARE GUIDELINES AS ITS STANDARD MEDICAL NECESSITY CRITERIA FOR RESIDENTIAL BEHAVIORAL HEALTH TREATMENT.

### A.     Breach of the Duty of Due Care

53.     As alleged above, as a claim administrator and ERISA fiduciary, one of HCSC's fiduciary duties is to use due care in interpreting the written terms of the plans it administers, including when selecting the standard criteria it will use to make determinations about whether requested services are consistent with generally accepted standards and thus medically necessary.

17

54.     When HCSC decided to use the MCG Behavioral Health Care Guidelines to make medical necessity decisions under the Plaintiff's Plans, HCSC had access to the independent, publicly available sources referenced in paragraph 24 above, which describe the generally accepted standards of medical practice.

55.     In the exercise of due care, HCSC thus knew, or should have known, what the generally accepted standards of medical practice actually are. Moreover, in the exercise of due care, HCSC should have recognized that the MCG Behavioral Health Care Guidelines for residential treatment were substantially more restrictive than those generally accepted standards, as alleged above.   HCSC nevertheless adopted the MCG guidelines as its standard medical necessity criteria, breaching its duty of care.

**B.      Breach of the Duty of Loyalty**

56.     As alleged above, as a claim administrator and ERISA fiduciary, HCSC also owes a duty to discharge its duties "solely in the interests of the participants and beneficiaries" of the plans they administers and for the "exclusive purpose" of providing benefits to participants and beneficiaries. A fiduciary breaches this duty if it serves its own interests, rather than those of plan participants, when administering a plan.

57.     HCSC has tremendous financial incentives to artificially suppress behavioral health costs by restricting coverage for treatment of chronic behavioral health conditions, especially costly residential treatment.

58.     HCSC makes money by charging fees for its services, including behavioral health claims administration.

(a)     For fully-insured plans like the Miller Plan, HCSC charges a premium, from which all approved benefits are paid. HCSC therefore bears the risk that benefit reimbursements will exceed the fixed premiums and/or any per-member, per-month rates

18

that HCSC allocates for behavioral health expenditures. As such, each request for coverage HCSC approves under a fully-insured plan directly decreases HCSC's profits.

(b)      For self-funded plans like the Souza Plan, HCSC is paid an administrative fee and the employer, as the plan sponsor, provides the funds to pay for the medical expenses that HCSC approves. HCSC has an incentive to reduce such medical expenses in order to retain business and sell its services as a cost-effective claim administrator.

59.      By adopting the MCG Behavioral Health Care Guidelines as its interpretation of the medical-necessity terms of the plans it administers, HCSC unreasonably narrowed the scope of coverage otherwise available under the terms of those plans, decreased the number and value of covered claims, and shifted some of the risk from itself and its employer customers to the participants and beneficiaries of the plans.

60.      Residential treatment, though widely recognized as a critical component in the behavioral health continuum of care, can be quite expensive. Avoiding benefit expense associated with providing coverage for residential treatment, therefore, directly benefitted HCSC's bottom line.

61.      On information and belief, these financial incentives infected HCSC's decision to license and use the MCG Behavioral Health Care Guidelines, including the "acute" residential treatment guidelines at issue herein.

**C.      Breach of the Duty to Comply with Plan Terms**

62.      As alleged above, HCSC also owes plan participants and beneficiaries a fiduciary duty to administer the plans in accordance with the written plan terms.

63.      As further alleged, the written terms of the Plaintiff's plans defined "medically necessary" services to be those that are, among other things, "in accordance with generally accepted standards of medical practice."

19

64.     By adopting medical necessity criteria that were much more restrictive than generally accepted standards of medical practice and using them to deny coverage for Plaintiffs' sons' residential treatment, HCSC breached its fiduciary duty to comply with their Plans' written medical necessity term.

## VIII.    HCSC DENIED COVERAGE TO PLAINTIFFS' SONS PURSUANT TO THE OVERLY-RESTRICTIVE MCG ACUTE RTC GUIDELINES IN CONTRAVENTION OF THEIR PLANS' WRITTEN TERMS

### A.    Plaintiff Souza

65.     Ms. Souza's son, who is now 19 years old, has struggled with mental health and substance use disorders since childhood. On February 26, 2018, when Ms. Souza's son was 16, he was admitted to Turn-About Ranch, a licensed residential treatment facility. He sought coverage under his Plan for the residential treatment services. Based on the recommendations of his treating physicians, Ms. Souza's son remained in residential treatment through June 22, 2018.  HCSC authorized coverage for 17 days, but it denied any further coverage from March 15, 2018 forward.

66.     In its May 24, 2019 written notification of its denial, HCSC stated that the denial "[r]eason" was that the "[r]equested service(s) does not meet clinical criteria, guidelines or standards of care for diagnosis." The letter further explained that "a medical necessity review [had] been completed" and that Plaintiff Souza's son "did not meet MCG Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines 20th Edition…".

67.     The letter further asserted that Plaintiff Souza's son did not meet the applicable MCG guideline because:

> [Y]ou were not a danger to yourself. You were not a danger to others. You were not aggressive. You were cooperative. You were doing therapy, including family therapy and group therapy. This could have been done in a non-24hr setting. From the information provided, you could have been safely treated in a different setting such as Mental Health Outpatient Services.

68.     Thus, the written notification of HCSC's denial shows that HCSC denied Plaintiff Souza's son's request for coverage pursuant to the MCG Behavioral Health Care Guidelines, which are more restrictive and impose more requirements for coverage than the terms of Ms. Souza's son's plan, as alleged above. In so doing, HCSC artificially narrowed the scope of coverage available under the terms of the plan and deprived Ms. Souza's son of his right to have his request for coverage decided according to the terms of his plan.

69.     Plaintiff Souza timely filed an internal appeal on her son's behalf on May 26, 2019. HCSC did not respond to that appeal. On September 20, 2019, Ms. Souza filed a request for independent review of HCSC's denial.  Rather than sending the case for external review, HCSC treated the September 20, 2019 submission as an internal appeal.

70.     HCSC denied the September 20, 2019 appeal on November 21, 2019, again based on the MCG Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines 20th Edition. HCSC's letter further stated that "internal appeal rights have been exhausted."

71.     Ms. Souza's son thus exhausted his administrative appeals under the Souza Plan.

72.     Ms. Souza's son incurred substantial out-of-pocket expense in connection with the residential treatment services he received from March 15, 2018 through June 22, 2018, for which HCSC wrongfully denied coverage.

**B.     Plaintiff Miller**

73.     Ms. Miller's son has suffered from schizoaffective disorder - bipolar type, and co-occurring alcohol and opioid use disorders for many years.

74.     On July 10, 2019, at his physician's direction, Ms. Miller's son was admitted to Lifeskills South Florida, a licensed residential treatment center. He sought coverage under his Plan for the residential treatment services. HCSC authorized coverage for about six weeks, but then

21

denied any further coverage from August 21, 2019 forward. Based on the recommendations of his treating physicians, Ms. Miller's son remained in residential treatment through February 2, 2020.

75.     In its August 23, 2019 written notification of denial, HCSC stated that the denial "[r]eason" was that the "[r]equested service(s) does not meet clinical criteria, guidelines or standards of care for diagnosis." The letter further explained that "a medical necessity review [had] been completed" and that Plaintiff Miller's son "did not meet MCG care guidelines Schizophrenia Spectrum Disorders: Residential Care (B-014-RES) 23rd Edition…". The letter further asserted that Plaintiff Miller's son did not meet the applicable MCG guideline because:

> You are not having thoughts to hurt yourself or others. You are not aggressive or violent. You have no side effects from your medicine. You are not hearing or seeing things that are not there. You could be treated at a lower level of care. From the information provided, you could be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment.

76.     Thus, the written notification of HCSC's denial shows that HCSC denied Ms. Miller's son's request for coverage pursuant to the MCG Behavioral Health Care Guidelines, which are more restrictive and impose more requirements for coverage than the terms of Ms. Miller's son's plan, as alleged above. In so doing, HCSC artificially narrowed the scope of coverage available under the terms of the plan and deprived Ms. Miller's son of his right to have his request for coverage decided according to the terms of his plan.

77.     Plaintiff Miller timely filed an internal appeal on her son's behalf on February 21, 2020. HCSC denied the internal appeal on March 2, 2020, again based on the MCG Care Guidelines for Schizophrenia Spectrum Disorders: Residential Care (B-014-RES), 22nd Edition.

78.     Ms. Miller's son thus exhausted his administrative appeals under the Miller Plan.

79.     Ms. Miller's son incurred substantial out-of-pocket expense in connection with the residential treatment services he received from August 21, 2019 through February 2, 2020, for which HCSC wrongfully denied coverage.

## IX.     HCSC'S ADOPTION AND USE OF THE MCG BEHAVIORAL HEALTH CARE GUIDELINES VIOLATED MHPAEA

80.     MHPAEA, codified at 29 U.S.C. § 1185a, amended ERISA to prohibit discrimination with respect to mental health and substance use disorder benefits. Because the parity provisions were inserted into ERISA, they are enforceable through ERISA's enforcement provision, 29 U.S.C. § 1132.

81.     Since the addition of the parity provisions, ERISA requires any group health plan that, like the Plaintiffs' Plans, "provides both medical and surgical benefits and mental health or substance use disorder benefits," to ensure that, among other things:

> … (ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

82.     MHPAEA's implementing regulations explain that "treatment limitations," which limit the scope or duration of benefits for treatment, may be quantitative (a "QTL"), *i.e.*, expressed numerically, or non-quantitative (an "NQTL").  The regulations prohibit the imposition of an NQTL on behavioral health benefits unless, as written *and* in operation, the processes, strategies, evidentiary standards, and other factors used in applying the NQTL to behavioral benefits are comparable to, and are applied no more stringently than, those used in applying the NQTL with respect to medical/surgical benefits in the same classification.  The regulations expressly provide that medical management standards (i.e., utilization review criteria) are NQTLs.

83.     On information and belief, in addition to licensing the MCG Behavioral Health

Care Guidelines, HCSC also licenses and uses MCG guidelines applicable to medical/surgical services, including those providing criteria for "Inpatient & Surgical Care," "General Recovery Care," "Recovery Facility Care," and "Chronic Care."

84.     As alleged above, MCG's guidelines reflect its view that while intermediate care for medical/surgical services is designed to address sub-acute conditions in order to improve functional status, intermediate care for behavioral health services is only intended "to support acute management" and to "address acute symptoms or provide crisis stabilization."

85.     The MCG Guidelines for intermediate care of medical and surgical conditions, including its guidelines for "Recovery Facility Care," provide for coverage for *sub-acute* conditions in order to improve functional status. Unlike the MCG Residential Acute Behavioral Health Level of Care Guidelines, the medical/surgical guidelines for intermediate treatment do not condition coverage on the presence of acute factors.

86.     Thus, by adopting and using the MCG Behavioral Health Care Guidelines to evaluate medical necessity of behavioral health residential services, HCSC applied treatment limitation(s) to inpatient (intermediate) mental health and substance use disorder benefits that were "separate" and/or "more restrictive" than HCSC's treatment limitation(s) for inpatient (intermediate) medical/surgical benefits.

87.     Under the MCG Guidelines, moreover, medical necessity determinations for inpatient (intermediate) mental health and substance use disorder services are based on factors that are not comparable to, nor used the same way as, factors in determining medical necessity for inpatient (intermediate) medical/surgical services, including acuity.

88.     For these reasons, HCSC's adoption and use of the MCG Behavioral Health Care Guidelines for residential treatment also violated MHPAEA.

89.     By using the MCG Behavioral Health Care Guidelines to deny Plaintiffs' sons' requests for coverage, therefore, HCSC imposed more restrictive limitations on their mental health benefits than those imposed on medical/surgical benefits, thus subjecting Plaintiffs' sons to exactly the type of unlawful discrimination MHPAEA was enacted to prevent.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

91.     The policies and practices that HCSC followed when determining whether to approve the requests for coverage submitted by Plaintiffs' sons are the same as HCSC has applied to other similarly-situated plan participants and beneficiaries seeking coverage under their health plans for residential behavioral health treatment, including HCSC's denials of coverage pursuant to the MCG Residential Acute Behavioral Health Level of Care, Adult guidelines; the Residential Acute Behavioral Health Level of Care, Child or Adolescent guidelines; the Schizophrenia Spectrum Disorders: Residential Care guidelines; or other MCG Behavioral Health Care Guidelines that contained the same excessively restrictive medical necessity criteria.

92.     As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring each of their claims, set forth in the counts below, on behalf of the following class ("Class") of similarly-situated individuals:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a behavioral health disorder was denied by HCSC, in whole or in part, within the applicable statute of limitations, based on the MCG Behavioral Health Care Guidelines.

93.     The members of the Class can be objectively ascertained through the use of information contained in HCSC's files because HCSC knows who the participants and

beneficiaries of the plans it administers are, which plans they are members of, what type of claims they have filed, and how those claims were determined.

94.     Upon information and belief, there are so many persons within the putative class that joinder is impracticable. While Plaintiffs do not have access to the identity of the putative class members, such information is within the possession and control of HCSC.

95.     Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the Class. Such common questions of law and fact include, but are not limited to: (a) whether the MCG Behavioral Health Care Guidelines at issue herein are consistent with generally accepted standards of medical practice; (b) whether HCSC breached its fiduciary duties when it selected the MCG Behavioral Health Care Guidelines as its standard medical-necessity criteria; (c) whether HCSC breached its fiduciary duties when it used the MCG Behavioral Health Care Guidelines at issue herein to deny requests for benefits for residential treatment; (d) whether HCSC's use of the MCG Behavioral Health Care Guidelines to deny requests for coverage of residential treatment of behavioral health disorders violated the terms of the class members' plans; and (e) whether the MCG Behavioral Health Care Guidelines are more restrictive than the medical necessity criteria HCSC uses to evaluate intermediate medical/surgical services.

96.     Certification is desirable and proper because Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent.

97.     Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of the Class they seek to represent. There are no conflicts between the interests of Plaintiffs and those of other members of the Class, and Plaintiffs are cognizant of

26

their duties and responsibilities to the entire Class. Their attorneys are qualified, experienced and able to conduct the proposed class action litigation.

98.     It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

99.     The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Class through numerous separate actions.

**COUNT I**
**Claim for Breach of Fiduciary Duty**
**(Selection and Use of Plan-Violating Coverage Criteria to Deny Coverage)**

100.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

101.     Plaintiffs bring this count, on behalf of their sons and all others similarly situated, pursuant to 29 U.S.C. § 1132(a)(1)(B).

102.     As explained above, HCSC is responsible for interpreting all of the employer-sponsored plans it administers, determining whether services are covered under the terms of those plans, and making final and binding decisions about whether to approve coverage requested by plan members for prescribed services. As such, HCSC has discretionary authority and responsibility in the administration of the plans, and HCSC has and exercises discretionary authority and control with respect to the management of the plans and the disposition of plan assets. HCSC is therefore an ERISA fiduciary as defined by 29 U.S.C. §§ 1002(21)(A) and 1104(a).

103.     As an ERISA fiduciary, pursuant to 29 U.S.C. § 1104, HCSC owed a duty of loyalty to plan participants and beneficiaries, which required it to discharge its duties "solely in the interests of the participants and beneficiaries" of the plans it administers and for the "exclusive

purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan. HCSC also owed plan participants and beneficiaries a duty of care, which required it to act with reasonable "care, skill, prudence, and diligence" in carrying out its responsibilities with respect to plan administration. HCSC also owed plan participants and beneficiaries a fiduciary duty to discharge its duties with respect to plan administration in accordance with the terms of the plans, insofar as those terms were consistent with ERISA.

104.     HCSC violated each of these fiduciary duties when it adopted the MCG Behavioral Health Care Guidelines discussed herein as its standard interpretation of the medical necessity requirement under the Plaintiffs' and putative class members' plans and then used those overly restrictive criteria to determine whether to approve the Plaintiffs' and putative class members' requests for coverage of their residential treatment.

105.     Despite the fact that the Plaintiffs' and putative Class members' health care benefit plans provide for decisions about the medical necessity of residential behavioral health treatment to be made consistent with generally accepted standards of medical practice, and the fact that generally accepted standards of medical practice are widely available and well-known to HCSC, HCSC selected and adopted clinical coverage criteria that are far more restrictive than accepted standards of medical practice and used those criteria to adjudicate and deny claims. In doing so, HCSC did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not use the "care, skill, prudence, and diligence" ERISA demands of fiduciaries. It did not act in accordance with the terms of the Plaintiffs' or the Class members' plans.

106.     Instead, HCSC elevated its own interests above the interests of the plan participants and beneficiaries. By interpreting plan terms in this manner, HCSC artificially decreased the scope

of coverage available under the plans and imposed additional requirements for coverage, thereby transferring risk from itself and its employer customers to the participants and beneficiaries of the plans and severely limiting the availability of residential treatment services to Plaintiffs' sons and to the class members.

107.    As alleged further above, HCSC caused harm to Plaintiffs' sons and the Class members by denying their requests for coverage pursuant to these self-serving criteria in breach of its fiduciary duties. Plaintiffs' sons incurred substantial unreimbursed out-of-pocket expense. On information and belief, other class members also suffered monetary loss as a result of HCSC's wrongful denials, or were forced to forego treatment or obtain different treatment than the services for which they requested coverage.

108.    Plaintiffs seek the relief identified below to remedy this claim.

## COUNT II
## Arbitrary Denial of Benefits
### (Denying Benefits Pursuant to Criteria that Violate Plan Terms)

109.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

110.    Plaintiffs bring this count on behalf of their sons and the Class pursuant to 29 U.S.C. § 1132(a)(1)(B).

111.    HCSC violated ERISA by arbitrarily and wrongfully denying the Plaintiffs' sons' and the other class members' requests for coverage of residential treatment services. As alleged in detail above, HCSC denied Plaintiffs' sons' and the class members' requests for coverage, in whole or in part, based on excessively restrictive medical necessity criteria that were incompatible with the plans' requirement that medical necessity be determined "in accordance with generally accepted standards of medical practice." As such, HCSC's denials of coverage were arbitrary and capricious and an abuse of HCSC's discretion.

112.     As alleged further above, HCSC injured Plaintiffs' sons and the other members of the putative Class by denying their requests for coverage pursuant to criteria that violated their plans, thereby depriving them of their right to have coverage decided according to the written plan terms. As a consequence of HCSC's wrongful denials, Plaintiffs' sons incurred substantial unreimbursed out-of-pocket expense. On information and belief, other class members also suffered monetary loss as a result of HCSC's wrongful denials, or were forced to forego treatment or obtain different treatment than the services for which they requested coverage.

113.     Plaintiffs seek the relief identified below to remedy this claim.

### COUNT III
### Claim to Enjoin Ongoing ERISA Violations

114.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

115.     Plaintiffs bring this count on behalf of their sons and the putative Class, pursuant to 29 U.S.C. § 1132(a)(3)(A), only to the extent that the Court finds that the injunctive relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

116.     Plaintiffs' sons and the other members of the putative Class have been harmed, and are likely to be harmed in the future, by HCSC's breaches of fiduciary duty and/or violations of ERISA described above because HCSC continues to use the excessively restrictive MCG Behavioral Health Care Guidelines as its standard medical necessity criteria.

117.     In order to prevent HCSC's ongoing breaches of fiduciary duty and violations of ERISA and the applicable plans, and the harm those violations cause, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV
### Claim for Appropriate Equitable Relief
### to Redress ERISA Violations

118.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

119.    Plaintiffs bring this count on behalf of their sons and the other members of the putative Class pursuant to 29 U.S.C. § 1132(a)(3)(B), only to the extent that the Court finds that the equitable relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

120.    Plaintiffs' sons and the other members of the putative Class were harmed by HCSC's breaches of fiduciary duty and/or violations of ERISA described above. Plaintiffs' sons incurred substantial unreimbursed out-of-pocket expense. On information and belief, other class members also suffered monetary loss as a result of HCSC's wrongful denials, or were forced to forego treatment or obtain different treatment than the services for which they requested coverage.

121.    In order to completely and adequately remedy these harms, Plaintiffs and the putative Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## COUNT V
### Parity Violation
### (Denying Benefits Pursuant to NQTL Factors that are
### More Restrictive than for Medical/Surgical Benefits)

122.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

123.    Plaintiffs bring this count on behalf of their sons and the putative Class pursuant to 29 U.S.C. § 1132(a)(3) and 29 U.S.C. § 1185a.

124.    The medical necessity requirement in the Plaintiffs' and class members' plans is a non-quantitative treatment limitation. As such, MHPAEA required the processes, strategies,

evidentiary standards, and other factors HCSC used in applying the medical necessity requirement to the Plaintiffs' and class members' requests for coverage of behavioral health residential treatment, as written *and* in operation, to be comparable to, and applied no more stringently than, those HCSC used with respect to medical/surgical benefits in the same classification.

125.    The MCG Behavioral Health Care Guidelines for behavioral health residential treatment are more restrictive, as written, than the MCG guidelines for medical/surgical treatment in the same classification (i.e., intermediate inpatient care).

126.    HCSC thus violated MHPAEA by imposing the MCG Behavioral Health Care Guidelines on Plaintiffs' sons' and the class members' behavioral health benefits and using those discriminatory standards to deny Plaintiffs' sons' and the class members' requests for coverage of residential treatment services.

127.    HCSC injured Plaintiffs' sons and the other members of the putative Class by imposing a non-quantitative treatment limitation on their behavioral health benefits that was more restrictive than those imposed on medical/surgical benefits and using that discriminatory standard to deny their requests for coverage. As a result of the unlawful denial of coverage, Plaintiffs' sons incurred substantial unreimbursed out-of-pocket expense. On information and belief, other class members also suffered monetary loss as a result of HCSC's wrongful denials, or were forced to forego treatment or obtain different treatment than the services for which they requested coverage.

128.    Plaintiffs seek the relief identified below to remedy this claim.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant as follows:

A.    Certifying the Class and its claims, as set forth in this Complaint, for class treatment;

B.    Appointing the Plaintiffs as Class Representatives for the Class;

C.      Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as class counsel;

D.      Declaring that the MCG Behavioral Health Care Guidelines for residential treatment used by HCSC as alleged herein were and are inconsistent with generally accepted standards of medical practice;

E.      Declaring that the MCG Behavioral Health Care Guidelines for residential treatment used by HCSC as alleged herein were and are more restrictive than the medical necessity standards HCSC used with respect to medical/surgical services in the same classification;

F.      Issuing a permanent injunction ordering HCSC to stop using the MCG Behavioral Health Care Guidelines complained of herein to evaluate the medical necessity of covered behavioral health services, and instead to use clinical coverage guidelines that are MHPAEA-compliance and consistent with generally accepted standards of medical practice;

G.      Issuing a permanent injunction ordering HCSC, when evaluating the medical necessity of covered behavioral health care services, to apply the criteria and guidelines set forth in the most recent versions of treatment criteria developed by the nonprofit professional association for the relevant clinical specialty;

H.      Ordering HCSC to reprocess the claims for residential behavioral health treatment that it previously denied (in whole or in part) under the MCG Behavioral Health Care Guidelines for residential treatment or any other MCG Guidelines containing the same restrictive criteria, pursuant to the most recent versions of treatment criteria developed by the nonprofit professional association for the relevant clinical specialty;

I.      Awarding other appropriate equitable relief, including but not necessarily limited to additional declaratory and injunctive relief;

J. Awarding Plaintiffs' disbursements and expenses for this action, including reasonable counsel and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

K. Granting such other and further relief as is just and proper.

Dated: August 20, 2021  Respectfully submitted,

By: /s/ D. Brian Hufford

ZUCKERMAN SPAEDER LLP
D. Brian Hufford, Attorney-in-Charge for Plaintiffs
(*pro hac vice motion forthcoming*)
Jason S. Cowart (*pro hac vice motion forthcoming*)
Devon Galloway (*pro hac vice motion forthcoming*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com
dgalloway@zuckerman.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (*pro hac vice motion forthcoming*)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com

PSYCH-APPEAL, INC.
Meiram Bendat (*pro hac vice motion forthcoming*)
7 West Figueroa Street, Suite 300
PMB #300059
Santa Barbara, CA 93101
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

*Attorneys for Plaintiffs*